**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **ANITA J. HLADISH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:06-CV-00300** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Anita Hladish appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2]

(*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be

AFFIRMED.

## I.  PROCEDURAL HISTORY

Hladish's DIB insured status expired on December 31, 1996, which is pivotal to this

appeal. (Tr. 93.)  On October 11, 2002, almost six years after her date last insured ("DLI"),

Hladish applied for DIB, alleging that she became disabled *eleven years earlier* on August 31,

1991. (Tr. 97-99.)  The Commissioner denied her application initially and upon reconsideration,

and Hladish requested an administrative hearing. (Tr. 26-28.)  On October 28, 2004,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Hladish, who was represented by counsel, Hladish's husband, and Joseph Thompson, a vocational expert ("VE"), testified. (Tr. 316-41.)  On February 25, 2005, the ALJ rendered an unfavorable decision to Hladish. (Tr. 53-61.)  Hladish submitted a timely request for review to the Appeals Council, who vacated the decision and remanded the case for further proceedings. (Tr. 31-34.)

On remand, the ALJ held a supplemental hearing during which the same witnesses testified. (Tr. 342-69.)  On December 15, 2005, the ALJ issued a second unfavorable decision to Hladish, concluding that she was not disabled despite the limitations caused by her impairments because she could perform her past relevant work, as well as a significant number of other jobs in the national economy. (Tr. 11-25.)  The Appeals Council denied Hladish's request for review, making the ALJ's second decision the final decision of the Commissioner. (Tr. 4-9.)

Accordingly, Hladish filed a complaint with this Court on August 28, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II.  HLADISH'S ARGUMENTS

Hladish alleges four errors in the Commissioner's final decision.  Specifically, Hladish claims that the ALJ erred by: (1) improperly determining that her impairments did not meet or equal a listing; (2) improperly evaluating the opinion of the state agency physicians; (3) determining that her testimony of debilitating limitations was "not entirely credible"; and (4) failing to incorporate all of her impairments into the hypothetical posed to the VE at step five. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 6-22.)

2

### III.  FACTUAL BACKGROUND[3]

On December 31, 1996, that is, her DLI, Hladish was thirty-eight years old; had a high

school education and had completed three years of college; and possessed work experience as an

account clerk, teller, and customer service clerk. (Tr. 102, 107, 148-49.)  Hladish states that she

stopped working on May 4, 1991, as a result of the birth of her oldest son just two days later. (Tr.

101.)  Hladish alleged in her DIB application that she became disabled as of May 5, 1991, due to

multiple sclerosis ("MS"), trigeminal neuralgia,[4] and depression. (Tr. 101.)

#### A.  Hladish's Testimony at the Hearings

At the hearings, Hladish testified that prior to her DLI she lived in a single-story home

with her husband, who worked the day shift full-time outside the home, and her two young sons.

(Tr. 321.)  Hladish's oldest son was born on May 6, 1991, one day after her alleged onset of

disability, and her second son was born on December 15, 1994. (Tr. 101, 321, 357.)  Therefore,

at the time of her DLI, Hladish's sons were ages five and two. (Tr. 321.)

Hladish explained that prior to her DLI she was able to bathe and dress herself but that

she generally wore pullover garments and slip-on shoes because she had trouble with the

coordination of her fingers; she stated that it might take her ten minutes to fasten buttons or

buckles. (Tr. 323, 347.)  She reported that she "could do some" household work but that it would

take her "[a] lot longer than normal." (Tr. 324.)  She elaborated that she would "dust a few large

things," but that she would not vacuum "because it was too tiring to move the vacuum around."

---

[3] The administrative record in this case is voluminous (369 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[4] Trigeminal neuralgia is defined as severe facial pain due to a disorder of the fifth cranial nerve. *The Merck Manual* 1874-75 (Mark H. Beers & Robert Berkow, eds., 17th ed. 1999).

(*Id.*)  Hladish also stated that she did "[v]ery little" cooking because she "could not stand on [her] feet" and because her "right hand just wouldn't cooperate." (Tr. 324-25.)  Hladish further reported that she suffered from significant fatigue and that "a lot of things would just wear [her] out [and] make [her] tired," stating that she "would just have to sit down and take a rest." (Tr. 324.)  Hladish summarized her typical day by saying that she really did not do very much at all. (Tr. 328-29.)

Hladish also testified that prior to her DLI she "could not walk by [her]self." (Tr. 345.) More particularly, Hladish explained: "I more or less just had to hang on to my husband's arm, or just some kind of assistance because I couldn't do it on my own. [Otherwise,] . . . I just stumbled around and fell." (*Id.*)  She stated that without assistance she could walk by herself "just a few feet." (Tr. 326.)  Hladish added that she generally fell three or four times a day at home, even though she held on to furniture while ambulating. (Tr. 346.)  She further reported that she could stand in one place for "[l]ess than a minute" though she could "sit without a problem." (Tr. 327.)

In addition, Hladish stated that she stopped driving in 1995 or 1996 because she "had trouble moving [her] foot around," noting she started wearing her ankle brace at that time. (Tr. 323.)  However, she reported that she stopped driving at night in 1991 due to difficulty with depth perception.[5]  (*Id.*)  She also stated that she had no hobbies and that she engaged in only minimal social activities, such as a friend coming over to visit her or telephone conversations. (Tr. 325.)  She explained that she did not go to shopping centers or movies, as the trips would

---

[5] Though Hladish testified that she stopped driving in 1995 or 1996, she stated at the second hearing that she and her husband still owned and insured two cars and that she still maintained her driver's license for emergency purposes. (Tr. 360.)

wear her out too much, though she did go grocery shopping with a friend occasionally. (*Id.*) Hladish also stated that she did not go outdoors much because her MS symptoms were exaggerated by the changes in temperature. (Tr. 346-47.)

Hladish further reported that she had memory and concentration problems prior to her DLI, stating that she had to write down things to remember what to do. (Tr. 329.)  More specifically, she stated that she had problems trying to coordinate a meal or concentrating on a movie plot. (Tr. 325, 329.)  She also confided that she used to enjoy reading a lot but that she now had to frequently "restart a sentence." (Tr. 346.)  When asked if she experienced depression prior to her DLI, Hladish explained that she experienced "denial" and "disappointment" about her condition. (Tr. 347.)

Hladish's husband also testified at both hearings, essentially corroborating Hladish's testimony concerning her activities prior to her DLI. (*See* Tr. 330-32, 348-57.)  In addition, he stated that when he came home from work, "a lot of times" Hladish would be sitting in the same place that she was when he left in the morning, asserting that she "just didn't have energy to move." (Tr. 331, 349-50.)  He also confided that Hladish at times became belligerent because of her inability to perform tasks around the house and her frustration with the disease and that she had great difficulty in adjusting to any changes in routine. (Tr. 353-54.)  He affirmed that she got easily confused with any in-depth discussions and thus has not been able to maintain her social functioning. (Tr. 356.)  He also testified that he always carried the babies to Hladish for nursing or other care after she dropped her oldest son "once or twice," contending that her arm would give way without warning or that she would fall without warning. (Tr. 354.)  He explained that "it was just too risky for her to try to raise them that way," stating the obvious that "you don't

5

want your kids to get hurt." (*Id.*)

Nonetheless, upon further questioning by the ALJ at the end of the second hearing, Hladish confided that prior to her DLI she cared for her sons while her husband was at work forty hours a week. (Tr. 358.)  She explained, however, that after the age of two her sons attended preschool in the morning; thus, she just had to made sure they were ready to ride the bus to school in the morning. (*Id.*)  However, from 1991 through 1993, Hladish apparently cared for her older son all day, and from 1994 through 1996, she apparently cared for her younger son all day, as well as her older son in the afternoon.  When asked if she received assistance with her children from anyone, Hladish stated: "There were some neighbors that would come in and help out quite a bit." (*Id.*)  When asked what her young sons did in the summer when school was out, she stated: "Play[ed] in the yard outside, maybe stayed within the area.  We have a very safe neighborhood. . . . I could see very close." (*Id.*)

### B.  Summary of the Medical Evidence Prior to Hladish's DLI

In 1981, Hladish was treated for optic neuritis. (Tr. 255.)

On April 11, 1990, Hladish was evaluated by Dr. Madhav Bhat, a neurologist, due to complaints of leg weakness. (Tr. 272-73.)  One month later and after further testing, Dr. Bhat diagnosed Hladish with MS. (Tr. 271.)  He told Hladish that no specific treatment was indicated at that time. (*Id.*)

On May 10, 1993, Hladish returned to Dr. Bhat, who indicated that her neurological symptoms were secondary to benign MS. (Tr. 156-58.)  Dr. Bhat noted that Hladish had no symptoms suggestive of an exacerbation in the last three years and that she has never needed any treatment for her MS. (*Id.*)  He advised Hladish to call him as needed if she developed any

aggravation of her symptoms. (*Id.*)

In June 1994, Hladish visited Dr. Bhat for an aggravation of her right leg weakness. (Tr. 154-55.) She denied experiencing any arm symptoms. (*Id.*) Dr. Bhat deferred intervention through medications, noting that Hladish was pregnant at the time. (*Id.*) Dr. Bhat recommended that she undergo physical and occupational therapy and that she be evaluated for an ankle foot orthosis for her right foot. (*Id.*) Hladish was then evaluated by a physical therapist, who noted that Hladish stated that "her function[al] status has remained the same" since her diagnosis. (Tr. 262.) The physical therapist concluded that physical therapy services were not needed, but gave Hladish home exercises and recommended that she get fitted for an ankle foot orthosis. (*Id.*)

On August 13, 1996, Hladish visited Dr. Bhat, complaining of intermittent aggravation of her right arm and leg weakness with a tendency of "tripping" on her right foot. (Tr. 152-53.) Dr. Bhat noted that she had marked improvement in her foot drop when using the ankle foot orthosis. (*Id.*) Hladish told Dr. Bhat that she ambulated either holding on to her husband or using a shopping cart at the grocery store and that she occasionally fell at home due to tripping on her right leg. (*Id.*) A neurological examination showed normal higher mental functions, speech, and cranial nerves. (*Id.*) Mild spastic weakness was present in her right arm and leg with hyperreflexia (grade 4/5). (*Id.*) She ambulated with a limp on the right. (*Id.*) Dr. Bhat concluded that Hladish's symptoms were secondary to relapsing-remitting MS and that she had a "fair" prognosis. (*Id.*) However, Dr. Bhat deferred intervention through medication since Hladish was nursing her younger son, stating that she should consider taking Baclofen in the future to control the spasticity in her right lower extremity. (*Id.*)

*C. Summary of the Medical Evidence After Hladish's DLI*

7

On June 11, 1997, Hladish was evaluated by Dr. Ajay Gupta for her MS, complaining of decreased endurance and energy. (Tr. 162-63A.) She told Dr. Gupta that she had greater involvement of her right side than her left and that her leg was more involved than her arm. (*Id.*) She also reported that she experienced intermittent stiffness in her extremities and that her symptoms were heat sensitive. (*Id.*) Hladish further stated that she had no cognitive impairment, as she had "good memory recall and good ability to learn recent and new information." (*Id.*) She did, however, confide that she experienced mild depression. (*Id.*)

Dr. Gupta noted that Hladish limped, favoring her right side. (*Id.*) She could do toe walking but heel walking was difficult; he noted that her muscle tone was slightly increased in her right leg. (*Id.*) Motor examination showed no atrophy, fasciculation, or involuntary movement, and strength ranging from 3/5 to 5/5. (*Id.*) Cerebellar examination showed mild dysmetria bilaterally, slightly more on the left than on the right. (*Id.*) Mild dysdiadochokinesia was present on the right and to a lesser extent on the left. (*Id.*) Heel-shin examination showed ataxia bilaterally, though less on the right. (*Id.*) He explained to Hladish that he believed she had relapsing-remitting MS, rather than benign MS, due to the progression of her symptoms. (*Id.*) He assigned her the following diagnoses: MS relapsing, remitting type; fatigue secondary to MS; and "perhaps" mild depression secondary to MS. (*Id.*) He recommended that she participate in physical therapy and a home exercise program and gave her literature on immunomodulator therapy with Betaseron and Copaxone, scheduling her to return in six months. (*Id.*)

On May 24, 1998, Hladish visited Dr. Thomas Banas for a neurological consultation. (Tr. 193-94.) His general examination was unremarkable, and his neurological examination showed an apparent intact mental status. (*Id.*) He noted that her reflexes appeared slightly brisk and that

she had weakness of her right lower extremity. (*Id.*)  He observed that her MRI showed an improvement from her previous MRI findings with no enhancement. (*Id.*)  Dr. Banas concluded: "At this time the patient appears to be stable." (*Id.*)  Four months later, Hladish followed up with Dr. Banas, who noted that she was "doing quite well with no appreciable decline." (Tr. 191-92.) Specifically, Dr. Banas observed that Hladish "stands and ambulates quite well with a mild limp using the AFO." (*Id.*)

In April 1999, Hladish again visited Dr. Banas, who noted that she "has seen no decline in her ambulation and no flare-ups that would be suggestive of relapse of MS." (Tr. 260-61.)  He observed that she "stands without difficulty and ambulates 25 feet very briskly within two to three seconds." (*Id.*)  He did not prescribe any prophylactic medication due to her "stable state" but instead recommended that she get involved with an exercise program such as swimming. (*Id.*)  Similarly, Dr. Banas noted in October 1999 that "there appears to be no functional decline." (Tr. 189-90.)  Specifically, he observed that Hladish "ambulates some 50 feet within three to four seconds." (*Id.*)

In May 2000, Hladish returned to Dr. Banas, who noted that "[t]he patient has remained stable and overall, apart from some fatig[u]ability and heat sensitivity, she is doing fairly well." (Tr. 187-88.)  He noted that she had "good control" of her depressive symptoms. (*Id.*)  Upon physical examination, Dr. Banas noted a delay in movement and clumsiness of both lower extremities but that she approached near normal power with some delay of the proximal muscles. (*Id.*)  He also observed that she stands and ambulates with a tendency to catch her toe on the carpet after fifty feet but that she ambulates this distance in approximately five seconds. (*Id.*)

On March 22, 2001, Dr. Paul Later, a neurologist, saw Hladish for symptoms of

trigeminal neuralgia. (Tr. 217-18.)  He stated: "Overall, her MS has been stable, aside from the recent trigeminal neuralgia flare-up." (*Id*.)  Hladish visited Dr. Later again in June 2001, and Dr. Later concluded that her trigeminal neuralgia was "under reasonable control." (Tr. 215-26.) Hladish's husband, however, told Dr. Later that Hladish's memory had decreased over the past six months; thus, Dr. Later reduced her medication. (*Id*.)  Dr. Later also noted that Hladish had started physical therapy services recently to improve her gait and the flexibility of her right knee, and he encouraged her to continue with this intervention. (*Id*.)  Dr. Later saw Hladish again in April 2002, and he adjusted her medication. (Tr. 212-14.)

On August 23, 2002, more than five years after her DLI and less then two months before Hladish filed her claim for DIB, Dr. Later penned a letter stating that Hladish was considering applying for DIB and that he believed Hladish "has significant cognitive impairments with more complicated calculations and memory tasks," contending that it "is her biggest point of disability." (Tr. 206-08.)  He noted that her gait pattern is spastic; that she is unable to toe, heel, or tandem walk; and that she loses her balance with a narrow-based stance. (*Id*.)  He opined: "Overall, I think the combined impairments significantly decrease her ability to work productively on any kind of an eight hour job five days a week [and that she is] disabled from any gainful employment." (*Id*.)

On January 11, 2003, more than six years after her DLI, Dr. Bijal Katarki examined Hladish's current status at the request of the Social Security Administration. (Tr. 198-200.)  Dr. Katarki noted that Hladish had an ataxic and unsteady gait, that she took only a few steps at a time, and that she held onto a table or her husband while walking. (*Id*.)  He stated that she could not walk on heels and toes, tandem walk, hop, squat, or rise from a squatted position. (*Id*.)  He

10

noted some dysarthria when Hladish spoke and that she spoke with slow speech, though she was not difficult to understand. (*Id.*)  He recorded muscle strength scores ranging from 2/5 to 5/5 and that her fine finger manipulation was abnormal. (*Id.*)  He concluded that her activities of daily living were affected by her MS and fatigue. (*Id.*)  He further opined that she could lift and carry no more than a couple pounds of weight; that she could walk only a few steps at a time and required assistance for stability; that she could have trouble pushing and pulling due to risk of falls; and that she would have trouble standing more than a few minutes at time due to extreme fatigue and weakness in her lower extremities. (*Id.*)  He noted, however, that she had no difficulty with prolonged sitting. (*Id.*)

On April 15, 2003, Dr. F. Montoya reviewed Hladish's medical record on behalf of the Social Security Administration. (Tr. 230-38.)  He concluded that prior to Hladish's DLI, she could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for at least two hours in an eight-hour day, sit about six hours in an eight-hour day, and perform unlimited pushing and pulling. (*Id.*)  He further opined that Hladish could occasionally climb, balance, stoop, kneel, crouch, and crawl. (*Id.*)  Dr. Montoya's opinion was later affirmed by a second state agency physician. (*Id.*)

Ten days later, Hladish underwent a mental status examination administered by Sherwin Kepes, Ph.D. (Tr. 249-52.)  The results did "not indicate significant problems with her general cognition." (*Id.*)  He did note, however, that she had some difficulty repeating digits backward and that she evidenced signs of irritability, emotionality, and general fatigue. (*Id.*)  He diagnosed Hladish with a dysthymic disorder. (*Id.*)

11

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V.  ANALYSIS

### A.  The Law

Under the Act, the claimant must be insured within the meaning of 42 U.S.C. § 423(c)(1) at the time she is "under a disability" in order to qualify for DIB. 42 U.S.C. § 423(a)(1).  Stated another way, to  recover benefits, a claimant must establish that she was disabled *as of her date last insured*. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (emphasis added).

12

If insured, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

On December 15, 2005, the ALJ rendered his opinion. (Tr. 11-25.)  He found at step one of the five-step analysis that Hladish had not engaged in substantial gainful activity since her alleged onset date and at step two that she had a severe impairment with respect to her MS, but not with respect to her other complaints. (*Id*.)  At step three, he determined that Hladish's impairment was not severe enough prior to her DLI to meet a listing for MS. (*Id*.)  Before proceeding to step four, the ALJ determined that Hladish's and her husband's testimony of debilitating limitations was "not entirely credible" (Tr. 22) and that she had the following RFC prior to her DLI:

> the claimant has the residual functional capacity to perform low stress light exertional level work activity absent a work requirement for climbing ladders, ropes, or scaffolds, absent a requirement to drive, absent working around unprotected heights and dangerous moving machinery, and the work would not involve a rate of production, but rather goal oriented work.  Finally, the claimant's residual functional capacity allows for work that only occasionally would require significant changes in the work setting (unexpected assignment of job duties with occasional defined as 1/3rd of the work day).

(Tr. 18.)

Based on this RFC and in reliance on the VE's testimony, the ALJ concluded at step four that prior to her DLI Hladish could perform her past relevant work as an account clerk, teller, and customer service clerk. (Tr. 11-25.)  In addition, the ALJ proceeded to step five where he determined that prior to her DLI  Hladish could perform a significant number of other jobs within the national economy, including a semi-skilled information clerk, semi-skilled input clerk, semi-skilled order clerk, unskilled telephone quotation clerk, and unskilled surveillance systems monitor. (*Id*.)  Therefore, Hladish's claim for DIB was denied. (*Id*.)

### C.  Substantial Evidence Supports the ALJ's Step Three Finding That Hladish's Impairment Did Not Meet or Equal a Listing Prior to Her DLI

Hladish first argues that the ALJ erred in finding at step three of his analysis that she did not meet or equal Listing 11.09B or 11.09C prior to her DLI.  Contrary to Hladish's contention, the ALJ's step three determination is well-supported by substantial evidence.

The listings describe impairments that are considered presumptively disabling when specific criteria are met. *See* 20 C.F.R. § 404.1525(a).  To meet or equal a listed impairment, a claimant must satisfy all of the criteria set forth in the listing. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).  As articulated *supra*, the burden of proving that her condition meets or equals a listed impairment rests with the claimant. *Id.*  Because it constitutes a medical judgment, an ALJ must consider an expert's opinion as to whether a claimant's medical impairment meets or equals a listing. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1526(b).  Furthermore, the ALJ must adequately explain his reasoning for finding that a claimant's impairment does not meet or equal a listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006); *Barnett*, 381 F.3d at 670.  Where the ALJ fails to adequately explain an adverse step three finding, a remand is required. *Ribaudo*, 458 F.3d at 583-84; *Barnett*, 381 F.3d at 670.

1.  <u>Listing 11.09B</u>

Hladish first contends that her condition met Listing 11.09B because she had a mental impairment arising from her MS prior to her DLI. (Opening Br. at 8-11.)

Listing 11.09B states:

11.09 Multiple sclerosis.  With . . .

      B.  Visual or mental impairment as described under the criteria in . . .12.02; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1109.  In turn, establishing an organic mental disorder

15

under Listing 12.02 requires:

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
> 1. Disorientation to time and place; or
> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
> 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
> 4. Change in personality; or
> 5. Disturbance in mood; or
> 6. Emotional lability (e.g. explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;
> AND
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

Here, substantial evidence supports the ALJ's finding that Hladish's condition did not meet or equal Listing 11.09B prior to her DLI. To explain, as the ALJ correctly observed (Tr. 21, 23), the record is utterly void of any medical evidence indicating a loss of Hladish's cognitive abilities prior to her DLI. In fact, the ALJ correctly deduced that the record indicates quite the opposite (Tr. 20, 23), as Dr. Bhat's neurological examinations in May 1990, May 1993, and August 1996 consistently reflected that Hladish exhibited normal mental functioning.

Hladish, however, criticizes the ALJ's reliance on Dr. Bhat's records, contending that "there is no indication in the record that any specific testing was done to lead Dr. Bhat to this conclusion" and that Dr. Bhat did not "describe the basis for this conclusion in his reports."

16

(Opening Br. at 8.)  Hladish's attempt to shift the burden to the ALJ at this juncture is futile.  It is Hladish who bears the burden to produce evidence that she suffered from a mental impairment that satisfied Listing 12.02 prior to her DLI, *Clifford*, 227 F.3d at 868, and she has utterly failed to do so here.  The ALJ is entitled to rely on the medical evidence of record, or the absence thereof, from the relevant period, including Dr. Bhat's notes. *See Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991) (acknowledging that the ALJ is entitled to give more weight to contemporaneous medical evidence than to medical opinions rendered in hindsight); *Kavicky v. Callahan*, No. 96-C-4205, 1998 WL 155923, at *9 (N.D. Ill. Mar. 30, 1998) (rejecting a conclusory, retrospective physician's report rendered three years after the claimant's date last insured where very minimal evidence existed of any complaints to physicians by claimant during the relevant period).

Moreover, although Hladish criticizes the ALJ for failing to articulate that Listing 11.09B can also be met by establishing affective changes, she utterly fails to establish that she exhibited any affective changes during the relevant period.  Indeed, the record reflects no complaints by Hladish of depression or other affective problems to her physicians during the relevant period. *Kavicky*, 1998 WL 155923, at *9; *see also Spyratos v. Sullivan*, No. 90 C 3861, 1992 WL 249598, at *11 (N.D. Ill. Sept. 25, 1992) ("A claimant bears the responsibility of providing medical evidence of a mental impairment.").  Instead, the record indicates that Hladish first complained of "mild depression" in June 1997, six months after her DLI. (Tr. 162); *see Spyratos*, 1992 WL 249598, at *11 (denying claimant DIB where no evidence indicated that claimant received any psychiatric treatment during the relevant period and the first diagnosis of mental impairment occurred after her date last insured).

As to the seven medically documented findings in Listing 12.02A and the four requirements in 12.02B, Hladish relies solely upon her and her husband's subjective allegations of her limitations.  This testimony alone fails to establish that she suffered from affective or cognitive changes during the relevant period, *Moothart v. Bowen*, 934 F.2d 114, 117 (7th Cir. 1991) ("Absent the requirement of objective medical findings, disability hearings would turn into swearing contests."), particularly in light of the ALJ's determination that Hladish's and her husband's testimony was "not entirely credible." (Tr. 22.)

Nonetheless, Hladish doggedly advances additional arguments to support her contention that she met Listing 11.09B prior to her DLI.  For example, she argues that the ALJ erred by discounting the opinion of Dr. Later, who opined on August 23, 2002, that she was disabled.  Again, Hladish's argument is without merit, as the ALJ thoroughly explained his reasons for assigning no weight to Dr. Later's opinion.  He first noted that Dr. Later made no reference to when this level of alleged limitation may have started. (Tr. 21.)  He then observed that Dr. Later only started treating Hladish in February 2001, more than four years after her DLI, and that he had only seen her four times prior to rendering the opinion. (*Id.*); *see* 20 C.F.R. § 404.1527(d)(1); *Kavicky*, 1998 WL 155923, at *9.  Finally, he emphasized that Dr. Later's opinion addressed an issue that is solely reserved for the Commissioner. (*Id.*); *see* Social Security Ruling ("SSR") 96-5p (articulating that a medical source opinion on whether an individual is disabled "can never be entitled to controlling weight or given special significant").  Clearly, the ALJ's decision to assign no weight to Dr. Later's opinion is adequately articulated and supported by substantial evidence, and the Court will not accept Hladish's current invitation to merely re-weigh the evidence. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000)

18

(emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

Not to be deterred, Hladish advances yet another argument that ultimately lacks merit – that the ALJ should have sought the advice of a medical expert as to whether her condition equaled Listing 11.09 prior to her DLI. First, the ALJ noted that no treating or examining physician indicated that Hladish's condition equals any medical listing. (Tr. 18.) Even more significantly, however, the state agency physicians concluded that Hladish's impairment did not meet or equal a listing. (Tr. 26, 28.) To explain, the state agency physicians completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that Hladish was not disabled prior to her DLI. (*Id*.) The Seventh Circuit Court of Appeals has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (internal quotation marks and citations omitted). Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts."[7] *Id*. (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p. Because the state agency physicians' reports were sufficient, the ALJ was not required to consult additional medical experts concerning Hladish's condition.

---

[7] In addition, Hladish, citing SSR 83-20, contends that the ALJ had a duty to secure medical advice as to *when* she became disabled. SSR 83-20 sets forth the analytical framework for determining the onset date of disability; however, the ruling applies only when the ALJ determines that the claimant *is* disabled. SSR 83-20 ("The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations."). Here, the ALJ never concluded that Hladish was disabled; thus, there was no need to determine an onset date. *See Kavicky*, 1998 WL 155923, at *8. Therefore, Hladish's argument under SSR 83-20 is misplaced.

Therefore, substantial evidence supports the ALJ's finding that Hladish's condition did not meet or equal Listing 11.09B prior to her DLI.

2. <u>Listing 11.09C</u>

Hladish also purports that her condition met Listing 11.09C prior to her DLI. (Opening Br. at 12-16.)  Listing 11.09C states:

11.09 Multiple sclerosis.  With: . . .

C.  Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.09.

Again, substantial evidence supports the ALJ's conclusion that Hladish's impairment failed to meet or equal Listing 11.09C prior to her DLI.  As the ALJ correctly observed (Tr. 18), in May 1990, Dr. Bhat observed no focal motor weakness, opining that no specific treatment was indicated.  Likewise, in May 1993, Dr. Bhat documented normal strength in all extremities, unremarkable coordination, and unassisted ambulation with a mild limp on the right, stating that Hladish had experienced no symptoms suggestive of an exacerbation of her MS in the past three years.  In May 1996, Dr. Bhat's examination revealed only mild spastic weakness in Hladish's right arm and leg with hyperreflexia (grade 4/5) and ambulation with a limp on the right.  Based on this evidence, the ALJ reasonably concluded that Hladish's condition prior to her DLI did not meet Listing 11.09, despite the exacerbation of her MS symptoms in August 1996.

Furthermore, the medical evidence in the years immediately following Hladish's DLI fails to advance her argument. *See Anderson*, 925 F.2d at 222 (acknowledging that medical evidence post-dating a claimant's date last insured is relevant).  The ALJ observed Dr. Banas's

notation in April 1999, as well as his subsequent notes, that Hladish had seen no decline in her ambulation, that she had experienced no flare-ups suggestive of a relapse of her MS, that she had "performed well" with her ankle foot orthosis, that her husband told Dr. Banas that there had been no decline in her functioning, and that she could stand without difficulty and ambulate twenty-five feet very briskly within two to three seconds.

Moreover, Hladish's argument that her and her husband's testimony supports a finding that she met Listing 11.09C is once again unpersuasive, particularly since the ALJ determined that their testimony was "not entirely credible." (Tr. 22); *see* SSR 96-5p ("In most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation.").  Rather, the ALJ properly relied upon the medical evidence of record, including the opinion of the state agency physicians, in determining that Hladish's impairment did not meet or equal Listing 11.09C. *See id*.

Therefore, the ALJ's step three finding is supported by substantial evidence, and thus Hladish's first argument falls flat.

### D.  The ALJ Properly Evaluated the Opinion of the State Agency Physicians

Next, Hladish asserts that the ALJ erred by relying upon the opinion of the state agency physicians when determining her RFC.  She argues that the ALJ should have instead assigned "little to no weight" to the opinion, contending that "it is very difficult to determine on what information the RFC assessment was based." (Opening Br. at 17-18.)

"RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or

her impairment(s)." SSR 96-6p.  Such opinions are to be evaluated considering the factors set

forth in 20 C.F.R. § 404.1527(d) to determine the proper weight to apply to them.[8] *Id*.; *see*

*generally Dixon*, 270 F.3d at 1177 (acknowledging that a consulting physician's opinion may

offer "the advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43

(7th Cir. 2000) (emphasizing that a consulting physician may bring expertise and knowledge of

similar cases).

Here, the ALJ properly considered the opinion of the state agency physicians as to

Hladish's RFC, sufficiently considering the factors set forth in 20 C.F.R. § 404.1527(d) before

assigning it "more weight" than the testimony of Hladish and her husband.  First, the ALJ

acknowledged that the state agency physicians were non-examining physicians. (Tr. 21); *see* 20

C.F.R. § 404.1527(d)(5).  Nonetheless, he noted that the state agency physicians "reviewed the

medical evidence of record established prior to December 31, 1996," thereby acknowledging that

their opinion was based on the medical evidence of record contemporaneous with the relevant

period. (Tr. 21); *see* 20 C.F.R. § 404.1529(d)(3).

Moreover, the ALJ assessed that the opinion of the state agency physicians was

"consistent with and supported by the medical evidence of record." (Tr. 21); *see* 20 C.F.R. §

404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the

more weight we will give to that opinion.").  Indeed, in that regard the state agency physicians

were the only medical sources of record who provided an opinion regarding Hladish's RFC with

respect to the relevant period.

---

[8] The factors articulated in 20 C.F.R. § 404.1527(d) include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.

Thus, the ALJ adequately explained his rationale for assigning "more weight" to the opinion of the state agency physicians than to the testimony of Hladish and her husband, allowing this Court to adequately trace his path of reasoning. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)).  Again, the Court will not accept Hladish's plea to merely substitute its judgment for the Commissioner's regarding the proper weight to assign to these opinions. *Clifford*, 227 F.3d at 869.

Consequently, Hladish's second argument does not merit a remand of the Commissioner's final decision.

### *E.  The ALJ's Credibility Determination Will Not Be Disturbed*

Third, Hladish contends that the ALJ's credibility determination is not based on substantial evidence "but rather on a bias against the claimant for the coincidence of the birth of her sons and the aggravation of her MS symptoms." (Opening Br. at 20.)  In fact, Hladish goes so far as to baldly assert that the "true reason that the ALJ rejected the claimant's and her husband's descriptions of her limitations is that he perceived them to be attempting to 'milk' the system when he believed that she had stopped working to raise her young children." (Reply Br. at 7.)  Hladish's brazen attack on the ALJ, however, utterly fails to warrant her requested relief.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see*

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ determined that Hladish's testimony of debilitating limitations was "not entirely credible," finding it inconsistent with her daily activities and with the objective medical evidence during the relevant time period. (Tr. 22.)  The ALJ then penned a lengthy paragraph pertaining to the credibility of the testimony of Hladish and her husband, providing numerous specific examples of each type of inconsistency. (Tr. 22-23.)

For example, the ALJ noted that Hladish's and her husband's testimony that she was unable to walk by herself prior to her DLI is not at all consistent with her ability to care for two small children on a daily basis when her husband was at work, even though the ALJ acknowledged earlier in his opinion that Hladish stated she received assistance from neighbors "quite a bit." (*Id.*; Tr. 358.)  "[An ALJ] is justified in discounting a claimant's allegations with respect to functional limitations . . . when he finds them to be inconsistent with the claimant's daily activities." *Shidaker v. Sullivan*, No. S89-307 (RDP), 1991 WL 432114, at *19 (N.D. Ind. Feb. 28, 1991); *see also* 20 C.F.R. § 404.1529(c)(3)(i); *see generally Bohrman v. Massanari*, No. 00-C-715-C, 2001 WL 1913387, at *12 (W.D. Wis. Aug. 22, 2001) (distinguishing cases in which the ALJ relied almost exclusively on the claimant's daily activities to discredit a physician's opinion, from cases in which the ALJ cited a claimant's daily activities as one of

several reasons to discredit a physician's opinion).

The ALJ next noted that Hladish's alleged inability to walk by herself prior to her DLI was starkly inconsistent with Dr. Banas's notation in April 1999, as well as Dr. Banas's subsequent notes, that Hladish had seen no decline in her ambulation, that she had experienced no flare-ups suggestive of a relapse of her MS, that she had "performed well" with her ankle foot orthosis, that her husband told Dr. Banas that there had been no decline in her functioning, and that she could stand without difficulty and ambulate twenty-five feet very briskly within two to three seconds. (Tr. 22–23.)  "An ALJ may discount a claimant's subjective assessments where they are internally inconsistent or inconsistent with other objective medical evidence in the record." *Shinaberger v. Barnhart*, No. 1:05-cv-0276-DFH-TAB, 2006 WL 3206338, at *13 (S.D. Ind. Mar. 31, 2006); *see also* 20 C.F.R. § 404.1529(c)(2), (4).

In addition, the ALJ noted that the absence of supporting medical documentation prior to Hladish's DLI was inconsistent with her subjective limitations, observing that "such a described degree of deficit would reasonably be expected to be documented within the medical evidence of record due to the resulting need for related necessary medical care and/or examination." (Tr. 22-23.)  Particularly, the ALJ thought that the absence of documentation from Dr. Bhat during the period of June 1993 through July 1996 was significant, as Dr. Bhat instructed Hladish in May 1993 to contact him if she developed any aggravation of her MS symptoms.[9] (*Id.*); *see Anderson*, 925 F.2d at 222; *Kavicky*, 1998 WL 155923, at *9 (finding a claimant's subjective allegations not credible where they lacked the support of contemporaneous medical evidence).  Thus, the

---

[9] The ALJ omitted mention of Hladish's June 1994 visit to Dr. Bhat.  However, at most this oversight constitutes harmless error, since Hladish apparently contacted Dr. Bhat only once in three years. *Shramek*, 226 F.3d at 814 (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

ALJ reasonably inferred that the aggravation of Hladish's symptoms in August 1996 and in June 1997 was "not part of a continuous pattern" prior to her DLI. (Tr. 23); *see Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) ("The ALJ was entitled to make reasonable inferences from the evidence before him . . . .").

The ALJ further observed that Hladish was not prescribed any prophylactic medication prior to her DLI. (Tr. 20); *see* 20 C.F.R. § 404.1529(c)(3) (considering a claimant's use of medication and treatment measures as two factors in analyzing claimant's subjective allegations); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).  In that vein, the ALJ noted that Hladish's treating physicians at times deferred the use of medication until such time as a decline in her functioning occurred. (Tr. 20; *see, e.g.*, Tr. 260-61.)  In addition, he noted that Hladish's May 1998 MRI showed no evidence of worsening of her MS, observing that it revealed some decrease in the size of the largest plaques in her left frontal lobe with other MS plaques being unchanged throughout the white matter and brain stem. (*Id.*)  The ALJ then emphasized that prophylactic medication was not employed until February 2001, causing him to reasonably infer that Hladish experienced no significant decline until that time, more than four years *after* her DLI. (*Id.*); *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 879, 882 (N.D. Ill. 1998) (determining that claimant was not disabled because her symptoms were not of disabling severity prior to her date last insured, though she was diagnosed with a progressive disease during the relevant period); *Kavicky*, 1998 WL 155923, at *8-9.

Despite the ALJ's extremely thorough credibility analysis, Hladish, citing *Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005), argues that the ALJ improperly equated her performance of household work and care for her two young children with an ability to return to the workforce.

26

Hladish's argument, however, is meritless, as the ALJ did nothing of the sort.  Rather, he properly considered Hladish's daily activities as one factor when evaluating her subjective complaints, concluding that significant inconsistencies existed between Hladish's subjective allegations of her limitations prior to her DLI and an ability, even with some help from neighbors, to care for two small children eight hours a day when her husband was at work. *See* 20 C.F.R. § 404.1529(c)(3); *Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); *Jones v. Barnhart*, No. 04 C 3532, 2005 WL 66072, at *10 (N.D. Ill. Jan. 10, 2005) (considering claimant's ability to care for his two children as probative of the credibility of his testimony of debilitating limitations).

In sum, Hladish's bald attack on the ALJ's credibility analysis is futile, as the ALJ built an extremely accurate and logical bridge between the evidence and his credibility determination, *Shramek*, 226 F.3d at 811, and his determination is not "patently wrong." *Powers*, 207 F.3d at 435.

### F.  Hladish's Step Five Argument is Moot, As Well As Duplicative

Finally, Hladish argues that substantial evidence does not support the ALJ's alternative step five finding that she could perform other work in the national economy, contending that it was based on an incomplete hypothetical question posed to the VE. (Opening Br. at 20-22.) Hladish contends that the ALJ failed to include in his hypothetical all of her subjective impairments, including that she purportedly had significant fatigue; had decreased coordination of her right hand; had problems walking unassisted and would fall two to three times a day; was sensitive to temperature changes; easily became confused and frustrated; and had difficulty focusing on tasks.

27

The Commissioner, however, argues that Hladish's step five argument is moot, since the ALJ found at step four of his analysis that Hladish could perform her past relevant work.  The Commissioner then emphasizes that Hladish waived any challenge to the ALJ's finding at step four, since she failed to raise a step four argument in her opening brief.  In reply, Hladish re-characterizes her step five argument as a step four argument.

The Commissioner's argument is persuasive, as "[a]rguments that are raised for the first time in a reply brief are waived." *Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991). Hladish waived any step four argument by failing to argue it in her opening brief.  Since the ALJ found at step four that Hladish could perform her past relevant work and thus was not disabled, Hladish's challenge to the ALJ's step five finding is inconsequential.

Nonetheless, even if Hladish's final contention were not moot, it is duplicative.  Her argument that her debilitating limitations "were thoroughly described by the claimant and her husband at the hearing" merely rehashes her second and third argument – that is, that the ALJ erred by declining to incorporate into his RFC determination all of the subjective limitations testified to by Hladish and her husband and by assigning significant weight to the opinion of the state agency physicians when determining her RFC.  In fact, Hladish even admits as much in her reply brief. (Reply Br. at 14 ("[T]he RFC finding is the subject of claimant's second and third arguments in her opening brief . . . .").  As concluded *supra*, these two arguments fail to warrant a remand; consequently, Hladish's final argument is also unavailing of relief.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

Clerk is directed to enter a judgment in favor of the Commissioner and against Hladish.

      SO ORDERED.

Enter for this 6th day of August, 2007.

                                  S/Roger B. Cosbey

                                  Roger B. Cosbey,
                                  United States Magistrate Judge